IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF OREGON

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | |
| | ) | |
| Plaintiff, | ) | No. CR 96-58-1-JO |
| | ) | |
| v. | ) | <u>OPINION AND ORDER</u> |
| | ) | |
| GREGORY FRANK SPERO, formerly known as | ) | |
| Gregory Frank Sperow, | ) | |
| | ) | |
| Defendant. | ) | |

Johnathan S. Haub
Assistant United States Attorney, District of Oregon
UNITED STATES ATTORNEY'S OFFICE
1000 S.W. Third Avenue, Suite 600
Portland, OR 97204-2902

  Attorney for Plaintiff

David T. McDonald
DAVID T. McDONALD, P.C.
808 S.W. Third Avenue, Suite 425
Portland, OR 97204

Doron Weinberg
WEINBERG & WILDER
523 Octavia Street
San Francisco, CA 94102

   Attorneys for Defendant

JONES, Judge:

Defendant Gregory Frank Sperow moves (# 29) to dismiss the indictment against him based on violation of his Sixth Amendment right to a speedy trial. On March 8, 2005, I held an all day hearing on the motion, taking testimony from numerous witnesses both in person and by teleconference. Following further briefing, on March 30, 2005, I heard closing arguments. After carefully considering the evidence and the parties' arguments and mindful of the standards that apply, I conclude that defendant's motion must be denied.

## APPLICABLE STANDARDS

My decision in this matter is guided by the four-part balancing test set forth in Barker v. Wingo, 407 U.S. 514 (1972), as interpreted in Doggett v. United States, 505 U.S. 647 (1992).[1] See also U.S. v. Aguirre, 994 F.2d 1454, 1456-58 (9th Cir. 1993)(analyzing and applying Doggett). The four relevant inquiries under the balancing test are:

> whether delay before trial was uncommonly long, whether the government or the criminal defendant is more to blame for that delay, whether, in due course, the defendant asserted his right to a speedy trial, and whether he suffered prejudice as the delay's result.

Doggett, 505 U.S. at 651 (citing Barker, 407 U.S. at 530).

---

[1] The "fugitive disentitlement doctrine" as described and urged by the government does not advance my analysis and will not be addressed.

With respect to the first factor, length of delay, if the time between indictment and trial "crossed the threshold dividing ordinary from 'presumptively prejudicial' delay," Doggett, 505 U.S. at 651-52, then I consider "the extent to which the delay stretches beyond the bare minimum needed to trigger judicial examination of the claim." Doggett, 505 U.S. at 652. In Doggett, the Supreme Court suggested that a delay of one year is presumptively prejudicial. Id. at 652 n.1.

With respect to the second factor, reason for delay, Doggett holds that whether the defendant must show actual prejudice depends on whether defendant or the government was responsible for the delay. Doggett, 505 U.S. at 656-58; Aguirre, 994 F.2d at 1456 (citing Doggett). If the government was negligent in pursuing defendant, prejudice against the defendant is presumed, and the weight of the prejudice is determined based on the length of the delay. Doggett, 505 U.S. at 657. If, however, the government pursued defendant "with reasonable diligence" then "'the speedy trial claim would fail . . . as a matter of course however great the delay, so long as [the defendant] could not show specific prejudice to his defense.'" Aguirre, 994 F.2d at 1456 (quoting Doggett, 505 U.S. at 656).

The third factor is whether in due course, the defendant asserted his right to a speedy trial. Here, defendant failed to assert his right during the eight-year period in which he was at large. Taken alone, that failure does not amount to a waiver of defendant's Sixth Amendment speedy trial right. U.S. v. Sandoval, 990 F.2d 481, 484 (9th Cir. 1993). If defendant is responsible for the delay, however, then this factor weighs heavily against him. Aguirre, 994 F.2d at 1457 and n.5; see also Sandoval, 990 F.2d at 483 ("[W]hen the defendant seeks to avoid

detection by . . . authorities and any post-indictment delay can be attributed to him, he waives the right to a speedy trial.").

With respect to the fourth factor, prejudice to defendant, if I find government negligence to be responsible for the delay, prejudice is presumed and defendant need not prove actual prejudice. Aguirre, 994 F.2d at 1456-57 (citing Doggett, 505 U.S. at 657). The presumed prejudice increases the longer the delay. United States v. Shell, 974 F.2d 1035, 1036 (9th Cir. 1992) (five year delay attributable to the government creates a "strong presumption" of prejudice).

If, however, I find that government proceeded with reasonable diligence, then defendant must show specific actual prejudice for his speedy trial claim to succeed. Aguirre, 994 F.2d at 1456. A showing of actual prejudice requires proof that the post-indictment delay harmed one or more of the interests protected by the speedy trial right. These are: (1) to prevent oppressive pretrial incarceration; (2) to minimize anxiety and concern of the accused; and (3) to limit the possibility that the defense will be impaired. Barker v. Wingo, 407 U.S. at 532.

## BACKGROUND

Surveillance related to an ongoing California undercover investigation into methamphetamine trafficking ultimately led law enforcement agents, on January 8, 1996, to observe Joseph Brock Rosemurgy (aka David Lipinski) and defendant Gregory Sperow[2] loading several metal "Knaack" containers and building wooden crates around them. The agents followed defendant and Rosemurgy as they delivered the crates to two different air freight

---

[2] According to Officer Michael Hook of the San Diego Integrated Narcotic Task Force, defendant was identified the night of January 7, 1996, during a traffic stop by a Pasadena Police Officer.

4 - OPINION AND ORDER

companies in Los Angeles. The agents learned from the freight companies that two containers were destined for Cleveland and Philadelphia, but were unable to determine the destination for a third container.

On January 10, 1996, a United States Customs Special Agent's dog[3] "alerted" on a large wooden crate inside the warehouse of Air Container Transport ("ACT") near the Portland International Airport. The crate had been shipped from Los Angeles on January 8, 1996. The agent reported the "alert" to a task force agent at approximately 11:40 a.m., and also contacted the general manager of ACT. The bill of lading for the crate identified the shipper as California Pacific Industries, and listed the consignee who was to pick up the crate as ACT, Att: Steve Casey.

Approximately two hours later, defendant[4] arrived at ACT and paid for the shipping costs with a money order that had been purchased by "CALIF PACIFIC INDUST." The ACT general manager contacted law enforcement, and several Portland Airport Interagency Narcotics Team task force agents arrived and confronted defendant. Defendant presented a California driver's license bearing the name "Gregory Frank Sperow" and an address of 101 Carol Way, Aptos, California. Defendant gave no Oregon address and denied knowledge of the contents of the crate. At the end of the conversation, an agent gave defendant a receipt for the crate and released him. Defendant then left the airport. Agents seized the crate.

---

[3] The dog, "Tonga OC-67," is reported to be a certified narcotics canine trained to detect marijuana, hashish, heroin, and cocaine. Memorandum in Support of the Accused's Motion to Dismiss Indictment, p. 2 n.2.

[4] Defendant does not concede that he is the person who attempted to claim the shipment, but for the purposes of the present proceeding, I will assume that the person was defendant.

5 - OPINION AND ORDER

The next day, January 11, 1996, the agents obtained a state search warrant for the crate. Inside the crate, agents found a "Knaack" brand container that was locked. Inside the "Knaack" container, agents found cardboard boxes full of sealed bags of marijuana. A total of 237 pounds of marijuana was seized.[5]

On January 12, 1996, Magistrate Judge Stewart issued a warrant for defendant's arrest, based on a complaint charging him with possession with intent to distribute marijuana. On February 14, 1996, a federal grand jury for the District of Oregon returned an indictment charging defendant with attempt to possess with intent to distribute in excess of 100 kilograms of marijuana. On February 15, 1996, Magistrate Judge Jelderks signed an arrest warrant based on the indictment.

Meanwhile, following his contact with agents at the warehouse, defendant disappeared from Oregon. On January 22, 1996, defendant signed a power of attorney form in Contra Costa County, California, granting attorney Lawrence Weitzman power to sign for him. The power of attorney was recorded in Los Angeles County on October 16, 1996. Sperow then went underground, for all practical law enforcement purposes. Agents finally located defendant living under the alias "Gregory Neil Westbrook" and arrested him in Orinda, California on May 26, 2004.

---

[5] Also on January 11, 1996, Rosemurgy, using the Lipinski alias, was arrested in Pennsylvania in connection with seizure of 150 pounds of marijuana and large amounts of cash. Rosemurgy was released and has not been seen by law enforcement officers since that date.

FINDINGS OF FACT AND CONCLUSIONS OF LAW

1. <u>Length of Delay</u>

The government concedes that the eight-year plus delay between indictment and arrest in this case is sufficient to trigger a speedy trial inquiry.

2. <u>Reason for Delay</u>

Defendant did not testify at the hearing, as is his right. Notably, no family members or friends appeared and testified on his behalf as to what he was doing during those eight years and whether he was or was not evading authorities.

Defendant claims that until his arrest in May 2004, he was unaware of the indictment in Oregon. Although defendant may not have known of the indictment *per se*, the evidence adduced at the hearing and discussed below permits a reasonable, if not compelling, inference that he knew he was in trouble and intended to evade justice.

After his unsuccessful attempt to retrieve the crate in Portland, defendant disappeared from this jurisdiction. He made no further attempt to retrieve the shipment, evidently preferring to abandon it and avoid any further contact with Oregon law enforcement. This belies any claim that he did not know the contents of the crate.

As noted above, shortly after he left Oregon, defendant signed a power of attorney authorizing Weitzman to act for him.[6] By January 18, 1996, defendant's known Los Angeles telephone had been disconnected, and by April 1996, his known vehicle had been sold. All attempts to locate him at known addresses led to dead-ends.

---

[6] I do not find the evidence that defendant previously granted Weitzman power of attorney to be significant, given the fact that defendant's criminal history as a drug smuggler dates back at least to 1976. See footnote 10.

7 - OPINION AND ORDER

The California driver's license defendant produced in Oregon on January 8, 1996, was seized by agents a few days later, on January 16, 1996, during a search of premises he owned at 1433 Mt. Pleasant, Glendale, California. There is no evidence that defendant ever again obtained a driver's license in the name "Sperow." Instead, by at least January 16, 1998, defendant had assumed the alias "Gregory Neil Westbrook," obtaining a driver's license and other papers in that name.[7] Defendant continued to use the Westbrook alias until his arrest in May 2004.

Defendant's parents, family members, and known acquaintances were non-cooperative with law enforcement agents, denying any knowledge of defendant's whereabouts or of having contact with him. The lead investigating officer in California, Michael Hook, who was involved in the undercover methamphetamine operation and who extensively worked the case in 1996, testified that he informed defendant's brother, Jeffrey Sperow, that his brother was wanted[8] and warned him against harboring a fugitive. The brother denied knowledge of defendant's whereabouts, even though he was in business with him. Significantly, Jeffrey Sperow did not appear at the hearing before this court and testify that he never reported his conversation with Officer Hook to defendant; neither did any of defendant's other friends and acquaintances with whom Hook had similar conversations.

---

[7] Defendant had used other aliases in the past, including Frank Edwards and William Fields. There is no evidence that defendant had any driver's license between January 1996 and January 1998, or if he did have one, what name it was issued under.

[8] Evading justice is evading justice; the fact that Hook was not talking about the Oregon indictment in his conversation with Jeffrey Sperow is immaterial to the important point, which is that assuming Jeffrey Sperow was in touch with defendant, which is a reasonable inference, he undoubtedly repeated the conversation with Hook to him. If defendant wanted to surface at that point, he certainly could have. He chose not to.

8 - OPINION AND ORDER

Defendant did continue some activities under his Sperow name. He filed yearly tax returns under the name Sperow. Attorney Weitzman prepared the tax returns. Defendant's address on the tax returns merely led back to Weitzman: C/O L.E. Weitzman, P.O. Box 4777, Chatsworth, CA 91313. Weitzman testified that if asked, attorney-client privilege would prevent him from revealing any information about defendant other than their attorney-client relationship. Thus, if obtained, the tax returns, like many other routes of investigation, would have led to a dead-end. I therefore find that the government was not negligent in failing to look for tax returns.

Defendant also held properties in the name Sperow, and was paid rent money and other moneys related to the properties in that name. According to the evidence, however, others, including his parents, managed the properties and received the payments; defendant did not collect the money himself.

Weitzman testified that he handled a half a dozen property transactions for defendant and was in business with him for a time. When asked if between 1996 and present, defendant ever told Weitzman that he was a fugitive, was wanted or had charges outstanding, Weitzman replied:

> A: No -- Not that way. No, there's no -- I had no knowledge of him being a fugitive. There was some problem. I understand that -- that they let him go and that was the end of that.
>
> Q: So Mr. Sperow had told you that he had had a problem and they let him go?
>
> A: Yes.
>
> Q: Did he tell you where that occurred?
>
> A: I believe it was in Oregon.
>
> Q: Did you ever ask him about it again?

9 - OPINION AND ORDER

> A: I talked to him once or twice, and I asked him if he had any problems with it or any warrants or anything happening, and he said not that he knows of.

Excerpt of Transcript, pp. 194-95. Thus, defendant admitted to his attorney that he knew, at the very least, that he had a problem in Oregon. That evidence permits a rationale inference that he knew the problem was his unsuccessful attempt to take possession of marijuana at the ACT warehouse.

Although Weitzman represented defendant and claimed to have handled property transactions for him, he denied any knowledge of police searches of defendant's properties, seizures of bank accounts, and civil forfeiture proceedings. Excerpt of Transcript, pp. 200-201. Given the long-term relationship between Weitzman and defendant and the fact that Weitzman held power of attorney on behalf of defendant, I find Weitzman's testimony in this regard not to be credible. Moreover, defendant had to be fully aware of the numerous searches, seizures, and forfeiture proceedings concerning his property in California. Yet with only one exception, there is no evidence that he attempted to appear in, interfere with, object to, or otherwise be personally involved in any of those proceedings.[9]

---

[9] The exception is a motion for return of money seized, which another attorney, Roger Christianson, filed on behalf of defendant in the U.S. District Court for the Central District of California in December 1996. Other than the motion and a minute order setting a briefing schedule, there is no further evidence concerning those proceedings. No evidence suggests that defendant made any personal appearance in the case.

10 - OPINION AND ORDER

Based on the above, I find that defendant, an experienced criminal drug trafficker,[10] intended to evade authorities in connection with any charges arising out of the unsuccessful marijuana shipment to Oregon as well as any charges arising out of his involvement with Rosemurgy in California. Defendant fled Oregon, never, according to the evidence, to return until captured. His family and friends were uncooperative; his name and papers false, his whereabouts shielded by layers of dead-end addresses, post office boxes, and abandoned mail drop sites. Defendant intended not to be caught, and it is only recent advances in computer search capabilities that ultimately led authorities to his doorstep.

Defendant attempts to shift the blame for the delay to the government. He contends that he was living in California under his own name, and not as a fugitive. In support of that contention, he points to his federal lawsuit in 1996, his tax returns, his role as registered agent for a defunct business, New Tech Construction, the Aptos address, and his property transactions within California.

As discussed above, had agents obtained defendant's tax returns, the returns would have led directly back to Weitzman, an admitted dead-end. New Tech Construction was managed by defendant's brother, Jeffrey Sperow, who when asked "flat out" by Officer Hook, denied having any knowledge concerning the whereabouts of his brother. Further, there is no evidence that

---

[10] In 1976, defendant was convicted in the District of New Mexico for the importation and possession of approximately 1,330 pounds of marijuana from Mexico and sentenced to a term of four years. Following a September 1980 indictment in the Southern District of California for conspiracy to import cocaine (4,000 pounds) and marijuana (200,000 pounds), and other charges, defendant was convicted on all charges and sentenced to a term of 15 years and 5 years, to run concurrently.

11 - OPINION AND ORDER

defendant's 1996 civil case, if discovered, would have yielded information sufficient to locate him.

The Aptos address is defendant's parents' address. In response to inquiries made in 1998 (the ruse call) and in 2003, the parents were uncooperative. And even though the mother, Geneva Sperow, admitted to Deputy U.S. Marshal Lawrence Gloth in October 2003 that she managed defendant's properties in Los Angeles, she denied having seen her son for 10 years. Thus, defendant was not living openly at the Aptos address, as he suggests, nor was he living openly as Gregory Sperow anywhere in California or Oregon.

Defendant contends that after the initial (and fruitless) investigation in 1996, the Oregon authorities' efforts to locate him were "perfunctory and ministerial" and, therefore, negligent. I disagree. Defendant did not remain in Oregon, a fact that is not disputed. He fled to California, where he assumed a false name and disappeared from all known addresses. Local Oregon agents utilized, to the extent time and funding allowed, the tools and technology available to them, performing checks for new information on a regular basis. No new information appeared. When agents developed leads, they sent them on to counterpart agents in California, who were also looking - unsuccessfully - for defendant.

Indeed, it is only defendant's evident confidence in his alias, a little bit of luck, and advances in technology that ultimately resulted in his capture. In January 2004, a friend of defendant's, Nancy Danno, brought a deed to Melissa Cook for notarization. Although she made the request for "John," the name on the deed was Gregory Sperow. Defendant was not present, but in violation of her obligations as a notary, Cook notarized the document anyway. After receiving a telephone call from someone wanting to see the signature, Cook scrambled to fix the

problem by requesting defendant's presence.  Defendant did present himself, thereby enabling Cook to later identify his photograph.

Deputy U.S. Marshal Ben Shapiro, who originally worked the case in Oregon until his transfer to Los Angeles in 2002, eventually received a collateral lead from Oregon that lead him to Cook.  His conversations with Cook, Danno, and a real estate broker who was suspicious of a sale of property involving Sperow began to yield useful information that pointed toward Northern California.  The most significant of this information was an address, obtained from Cook, in Orinda, California.

In Oregon, Deputy Gloth had taken over the investigation in 2003.  Following up on information received from Shapiro concerning a big loan in Orinda, California to a man named Dennis Carlston, Gloth learned that Carlston was a cocaine smuggler.  In pursuing information on Carlston, Gloth found minutes of an Orinda Planning Council meeting.  Specifically, Gloth located the minutes through the computer search engine Google, a tool that was not available to agents in the earlier phases of the investigation.[11]

What the minutes revealed is that a contractor, a man named Greg Westbrook, spoke before the planning council.  Gloth did not recognize that name, but did recognize the company associated with Westbrook, New Tech Construction, as a former business of defendant.  Knowing that New Tech Construction was defunct, Gloth became suspicious and sent a picture

---

[11] I take judicial notice that Google was founded in September 1998, and was a mere start-up looking for funding in 1999.  FRE 201(b).  There is no evidence as to when any relevant real property transactions or planning committee minutes went on-line and became searchable, but the earliest Orinda planning committee minutes available on-line are from 2003.  See www.ci.orinda.ca.us/meetings/planning.shtml.

13 - OPINION AND ORDER

of defendant to the Orinda Planning Commission. The Commission identified defendant as Westbrook.

With that information, the search for defendant quickly came to an end. Agents located him and arrested him at Dennis Carlston's property in Orinda on May 26, 2004. According to Gloth, had it not been for the Google search turning up New Tech Construction, he would have had no way to develop the information that defendant was using the name Greg Westbrook.

Based on the evidence and all reasonable inferences that may be drawn from it, I find that the government used reasonable diligence in pursuing defendant and that blame for the long delay between indictment and arrest rests squarely on him, brought about by his own evasive tactics. I further find that although defendant may have not specifically known that he had been indicted in Oregon, he certainly knew he was in trouble in Oregon on January 10, 1996, and certainly intended to escape that trouble by leaving the jurisdiction, never to return. Defendant chose not to contact Oregon authorities to resolve any outstanding issues or to seek delivery of the shipment, but rather chose to assume a false name and for all practical purposes, disappear.

3. <u>Defendant's Assertion of His Right to a Speedy Trial</u>

During the eight plus years following defendant's unsuccessful attempt to retrieve the shipment, he did not assert his right to a speedy trial until he filed the present motion. As the court in <u>Aguirre</u> stated, "[t]he Speedy Trial Clause primarily protects those who assert their right, not those who acquiesce in the delay -- perhaps hoping the government will change its mind or lose critical evidence." 994 F.2d at 1457 (citation omitted). Because I find that defendant has primary responsibility for the delay, this factor weighs heavily against him.

4.  Prejudice

Because the government exercised due diligence, any presumption of prejudice falls away and defendant must show actual prejudice. Aguirre, supra, 994 F.2d at 1456, 1458. There is no evidence that defendant has been actually prejudiced by the delay in any of the ways protected by the speedy trial right, including his ability to defend this case. See Barker, supra, 407 U.S. at 532.

In the absence of evidence of specific and actual prejudice, my analysis ends. Defendant's claim of violation of his Sixth Amendment right to a speedy trial is without merit, and his motion to dismiss the indictment (# 29) is denied.

IT IS SO ORDERED.

DATED this 15th day of April, 2005.

/s/ Robert E. Jones
ROBERT E. JONES
U.S. District Judge